JOHN F. BLACK

*v.*

SARAH J. THURSTON et al.

[Decided May 17th, 1906.]

1. Where a mortgage was satisfied in the hands of the mortgagee, one who subsequently took the mortgage from the mortgagee, with knowledge that it had been satisfied, acquired no rights under the mortgage.

2. Under the express provisions of *Gen. Stat. p. 2108 § 31*, the assignee of a bond and mortgage takes subject to all the equities of the mortgagor.

On bill, answer, cross-bill, answer to cross-bill, and proofs.

The bill in this cause seeks to foreclose a mortgage secured upon property at Saddle River, New Jersey, in the principal sum of $2,000, dated August 20th, 1895, made by Henry W. Thurston and wife to Theodore Wiedersheim. By Wiedersheim

this mortgage, on the 25th day of April, 1905, was assigned to Francis B. Clark, and, on the 23d day of May, 1905, was by Clark assigned to the complainant.

The defence, briefly stated, is that there is nothing due on the mortgage, and by a cross-bill the defendants seek to have the mortgage canceled.

*Mr. Maximilian T. Rosenberg,* for the complainant.

*Mr. John M. Enright,* for the defendants.

GARRISON, V. C.

The facts I find as follows: Thurston was a nephew of Nathaniel McKay, of Washington, District of Columbia. He and McKay had a joint interest in a bridge situate in the republic of San Domingo. McKay originally obtained the concession and transferred it to a company he caused to be incorporated, called the "New Jersey and San Domingo Bridge Company." Subsequently the rights of the company in this property were transferred to Thurston, and he held it for the equal benefit of himself and McKay. In the year 1895 Thurston was desirous of buying the property at Saddle River (upon which the mortgage in controversy was subsequently placed), and, for the purpose of making the necessary payment, obtained from McKay the sum of $2,000. Afterwards McKay directed him to make a bond and mortgage for this amount to a son-in-law of McKay's, named Theodore Wiedersheim. There is not the slightest doubt that Wiedersheim was a mere passive trustee holding this mortgage in trust for McKay.

In 1897 Thurston was operating a hosiery mill on the premises at Saddle River. Clark was in the employ of a banker and broker in Wall street, and had been acquainted with Thurston for many years. He and Thurston had been brought together previously in a business operation in which they were each interested. Thurston endeavored to get Clark to enter into partnership with him in the hosiery business. Clark declined, but as a result of their intercourse a corporation was formed to carry on the hosiery business at Saddle River. This corporation was

called the "Thurston-Clark Hosiery Company," and the details of its incorporation were entirely under the supervision and control of Clark. Clark put $7,000 into this business, for which he obtained seventy shares of stock. Thurston put in $3,000, for which he obtained thirty shares of stock, in addition to which each got some bonus stock, Clark getting forty-seven and Thurston twenty shares.

Clark now contends that, notwithstanding what was done at that time, including the written papers, the actual transaction and intention of the parties was of an entirely different character than the apparent one. He now insists that he did not then become a stockholder; that he did not embark his capital in this enterprise, but that his agreement was to loan the money which he put into the company to Thurston, and that the stock which he took was merely collateral to the obligation of Thurston. His present contention is that Thurston exhibited to him documents evidencing the interest of Thurston in the San Domingo bridge, and that, relying upon such interest, he agreed with Thurston to loan this money to Thurston for use in this hosiery business.

At that time, namely, in 1897, I do not think it appears that the award had been made by which the San Domingo government was to pay the owners of the bridge for it, that government having confiscated the bridge. Clark did not, at that time, obtain anything from Thurston by way of assignment, or in any other way evidencing Clark's interest in or lien on Thurston's share of the money to come from the bridge. Everything which the parties did at the time is directly contradictory of and in opposition to the theory now advanced by Clark.

I find that Thurston's testimony upon the vital point involved in this branch of the case is true, and that he did not in any way acquaint Clark with his interest in the San Domingo bridge until long after the period in 1897 when the hosiery company was formed. I find that when the hosiery company was formed, Thurston and Clark each went into it in the same way, namely, as stockholders embarking their money in the enterprise. I do not find the slightest evidence to show that Thurston became the creditor of Clark by reason of this transaction.

The business of the company was carried on by Thurston, as the practical operator of the mill, and by Clark and his son, as financial managers. In 1898 Thurston became ill, and was compelled to leave this part of the country, and for a short time thereafter Clark and his son continued to carry on the business, Clark advancing to the corporation, on its notes, considerable sums of money, the exact amount of which was not definitely shown, but somewhere between $7,000 and $9,000. Finally the business was stopped.

As has been before stated, the government of San Domingo confiscated the bridge in question, and the owners induced our government to take up the matter, which it did. Through the good offices of our government an arbitration was entered into between the parties, which in 1898 or 1899 resulted in an award in favor of Thurston, as the owner of the bridge, against the government of San Domingo for about $81,000 and interest, which was agreed to be paid in installments. The money was collected by our government, and it was arranged between McKay and Thurston that McKay was to collect the same, and for this purpose a power of attorney was lodged with the state department of the United States, by the terms of which Thurston empowered McKay to collect the money.

In 1901 Clark procured the Thurston-Clark company to turn over to him its machinery and tangible assets, the expressed condition being the notes of the company held by Clark. Although Thurston apparently was not consulted about his, he does not complain, and the transaction is therefore not attacked. Clark was very desirous of disposing of this machinery, and Thurston was equally anxious to obtain it, because he desired to resume the business of manufacturing hosiery. There were negotiations between Clark and Thurston, but as Thurston was without ready money they were fruitless. Finally it was arranged between Clark, Thurston and McKay that McKay should give to Clark his note for $3,000, at one year, and should cancel the $2,000 mortgage in question which he held upon the Saddle River property. Clark, upon his part, was to give a bill of sale for the machinery to McKay, and was to cancel a $1,500 first mortgage which he held upon the Saddle River property. This bar-

gain was carried out in all of its terms, excepting that McKay never did cancel the $2,000 mortgage.

From McKay's letters it is apparent that he was having trouble with his relatives. He had, up to this time, been married three times, and there was undoubtedly trouble between him and his immediate relatives. The wife of Wiedersheim was one of his children, and Wiedersheim held the title to this mortgage, and this probably is the explanation of why McKay did not procure a satisfaction piece of this mortgage at this time, as he had agreed to do.

In June, 1902, Thurston learned that McKay was about to marry for the fourth time. McKay was then seventy-one years of age, and for a long period had been in ill health. Thereupon Thurston went to Washington to see McKay, to endeavor to arrive at a settlement of their various business relationships. Up to that time McKay had collected from the government a large part, if not all, of the award. With interest, this amounted to something in the neighborhood of $92,000. All that he had ever given to Thurston had been $1,500 of notes, which he paid, and the $3,000 note which he had given to Clark, but which was not yet due.

At the interview in June of 1902 between Thurston and McKay the latter again agreed to cancel the $2,000 mortgage and to give to Thurston, as security for the balance due him from the San Domingo bridge, bonds of the Dewey Hotel Company, which company was one promoted and controlled by McKay. McKay instructed his Washington attorney to procure the cancellation of this mortgage, and almost immediately afterwards was married and went to Atlantic City, New Jersey, upon his wedding trip. From there he wrote to Thurston, asking him to come there, and stating that he would have the mortgage (the $2,000 mortgage in question) and bonds (the Dewey Hotel bonds). Before Thurston could comply McKay died. His death occurred on the 12th of July, 1902. After the death of McKay, Thurston put the collection of his claim against the estate of McKay in the hands of a Washington lawyer named MacMahon. On the 4th of November, 1902, Thurston wrote to Clark concerning the McKay estate, and in a long letter, dated No-

vember 7th, 1902, Clark replied. Clark continued to reside in New York, Thurston at this time having established himself at Rome, Georgia, where he was carrying on the hosiery business. The note for $3,000 given by McKay to Clark came due on the 5th of November, 1902, and was protested, and some time in the latter part of December, 1902, or the early part of January, 1903, Clark engaged Emilie Bullowa, a New York lawyer, to represent his interests. On the 17th of March, 1903, Clark wrote to Thurston that he had begun proceedings against the estate of McKay to collect his $3,000 note, and that he had applied to the court to be appointed collector of the estate. This apparently is a proceeding by which one in the nature of a receiver is appointed to gather in the assets of an estate either because the executors will not or because the court for good reason restrains them. In this letter Clark urges Thurston to consult the former's Washington attorneys, and see if they cannot combine their claims, so as to make a large showing to induce the court to appoint this collector. He requests Thurston personally to do this, but if he cannot, suggests that he have his Washington attorney do it. Thurston replied to this letter, and his reply shows entire compliance with the idea, and informs Clark that he has instructed his Washington attorney to act as suggested, and that if this does not produce the proper result, he will forward to Clark a power of attorney to act for him. The result of this correspondence was that on the 1st of April, 1903, Clark sends a form of a power of attorney, from Thurston to him, to Thurston, to be executed and returned, stating, "I will do the best I can in the matter for you, and hope for good results." The power of attorney, executed and returned by Thurston to Clark, is dated April 4th, 1903.

On the 7th of May, 1903, Clark writes to Thurston that the record title of Thurston to the moneys collected on account of the San Domingo bridge is good, but that the estate of McKay repudiates Thurston's claim, and threatens to defeat it by showing that he was merely the nominal owner of the bridge, the real interest being McKay's, and that evidence of the personal relations between McKay and Thurston, and any counter-claim or offset on behalf of McKay against Thurston, would be excluded

if suit against the McKay estate on Thurston's claim were brought by an outsider. He therefore suggests that Thurston assign his claim against the McKay estate to him, Clark, and encloses in this letter a form of assignment, with instructions as to how it should be executed. Thurston replies, under date of May 10th, and suggests that before he execute the assignment it would be well for them to have a complete understanding between them about the matter, and saying, "I would suggest you incorporate in same papers your terms for collecting same."

On the 14th of May, 1903, Clark replies to this, stating that he was disappointed and hurt at Thurston's refusal to execute the assignment, and reiterating the necessity of the suit being brought by an outsider, to have any chance of success, as otherwise it would be subject to proof that Thurston was not the real owner, but McKay was. In this letter Clark says that he had never thought of what he was to get out of it; that he only took hold of it for Thurston, with the intention of helping him, but that, since Thurston does not trust him, he feels like dropping the whole thing; that already he has expended considerable money, and "naturally I [he] will look for a return of moneys paid out and lost, and to lawyers, and all charges and expenses incurred." He then goes on to say that his wife and son are entirely familiar with the situation, and are his executors, and in case of his death they will live up to his instructions, and he then suggests to Thurston that if they have any private understanding, not expressed on the face of the assignment, he will be subject, when on the witness-stand, to interrogation which will develop the fact that he is not the owner of the Thurston claim, but is merely the holder of an assignment without consideration.

Thurston's reply to this was the enclosure of the executed assignment to Clark, without word or comment. This executed assignment is dated May 16th, 1903, the consideration being "for value received."

Some time after this (just when does not appear) Clark sends to Thurston a draft of a letter bearing date "Rome, Ga., May 4th, 1903," addressed to Clark, and signed "Henry W. Thurston." Accompanying this letter there is a memorandum, written by Clark and signed by his initials, as follows:

"My lawyers say they want to show that the assignment was made to me for value, and the larger the amount the better and more convincing it will be that it was made to me on legitimate transactions, and suggested that you write a letter to me, a copy herewith which will cover the case I think about that date. Let me have it soon. We are getting things in shape for testimony."

The drafted letter, which subsequently was signed by Thurston and mailed to Clark, was as follows:

"ROME, Ga., May 4th, 1903.

"*Mr. F. B. Clark:*

"DEAR SIR—As you doubtless are aware by this time that the estate of my late uncle, Nathaniel McKay, is not likely to be settled for some time to come, owing to what seems to me to be a disposition on the part of those in control of estate to underestimate it, and to conceal and hide from the creditors the properties belonging to it, and making it necessary to fight them in the courts, I wish to protect you, and propose assigning to you my claim for upwards of $90,000 against said estate to cover my indebtedness to you from the hosiery company and advances, which, with interest, amount to over $20,000, it having been my understanding that as soon as the San Domingo bridge award was paid by the government that I was to pay you, but as, you know, uncle died before I could effect a settlement with him for the money he collected as my attorney from the government under the bridge award, I was unable to do so, and now assign the matter over to you. You can sue the estate or collect it in any manner you may deem best for the protection of your interests.

"You had talks with Uncle Nat on several occasions when he called at your office in New York in November, 1901, when he told you he was going to settle with me at the time he gave you his note for $3,000 and took up the mortgage which you held on my place at Saddle River. I am afraid you will have to fight to recover under the claim, but knowing, as I do, that it is perfectly good, the estate representing in value more than $200,000, and my right to the money awarded to me under the bridge claim was established in the courts when Pell brought suit in Washington, I do not see how you can fail to collect from the estate the full amount, with interest, the debt my uncle's estate owes me for money collected by him as my attorney from the government under the award. I will give you later such information as I can to enable you to prosecute a suit if you bring one, and which will be at your cost.

"If you will have an assignment made out by your lawyer and send it to me here I will execute it and return it to you with a feeling that I will have done my utmost to protect you, as I told you I would if you left the matter in my hands. Thanking you for your patience and assistance, and hoping for an early collection of the money from the estate, I am, Yours truly, H. W. T."

This letter is practically the only evidence by which Clark seeks to show that Thurston acknowledged any indebtedness to him.

It was necessary to incorporate this letter in full because of its vital connection and of the light that it throws upon other important considerations in the case.

It is apparent that Clark's attorneys, upon investigating Thurston's claim against the estate of McKay, realized that this claim would meet with certain serious, if not insuperable, obstacles. They feared that the estate would be able to prove that Thurston had no real interest in the bridge, but was merely a dry trustee for McKay, and that, instead of McKay's being indebted to Thurston, Thurston was as a fact indebted to McKay, and that whatever this amount was would be claimed as an offset or counter-claim. They appreciated the legal situation, and concluded that if they could work an estoppel against the estate of McKay, any attacks upon the claim along the line just suggested would be harmless. Their client, Clark, had an absolute assignment of Thurston's claim, and if they could show, not only that Thurston was indebted to Clark, but that the money loaned by Clark to Thurston was advanced upon the faith of McKay's agreement that Thurston owned one-half of the bridge, the estate of McKay would be estopped, as against one who had advanced money upon McKay's own statement of Thurston's interest, to deny Thurston's interest. It therefore became necessary for Clark to assert that back in 1897, when he went into the hosiery business with Thurston, he did not do so as a stockholder, but merely as one who advanced money to Thurston upon the faith of McKay's agreement with Thurston by which the latter became the one-half owner of the bridge, and that such indebtedness still subsisted, and was the consideration for the assignment.

The latter part of this proof was sought to be established by the letter just quoted. It undoubtedly was fabricated to serve as proof, and was conceived solely by Clark, either alone or acting with his attorneys, and was signed by Thurston because Clark desired it, and not in any way as a truthful statement by Thurston of the existing facts. The intention, with respect to this paper, was to use it as an instrument of proof against the McKay estate. There is not the slightest basis for believing that, as between Clark and Thurston, it had any validity whatever.

Clark brought an action in Washington, District of Columbia, against the estate of McKay, based upon his own note of $3,000 and upon the assigned claim of Thurston. On the 29th of March, 1905, this case was called for trial in the supreme court of the District of Columbia, there being present Clark, Miss Bullowa (his New York attorney), Lambert & Baker (his Washington attorneys), Thurston, and the representatives of the McKay estate. After the case was called, and before response was made, a proposition of settlement was suggested by the attorneys of the estate. This was not within the hearing of Thurston. The court adjourned the case until the next day, and the parties separated, those on the side of the claimants going to the office of Lambert & Baker, and the others going to their respective offices. The negotiations were then carried on over the telephone, Clark, Miss Bullowa, Thurston, and Lambert & Baker being in the latter's offices. The last proposition received from the attorneys of the estate was to settle the entire claim for $12,500, of which a portion was to be paid by the mortgage of Thurston to McKay, and its accumulated interest.

Leaving Thurston at the offices of Lambert & Baker, the others went to the offices of the attorneys of the estate, and there made a final agreement on the terms just stated. That evening, at the hotel at which they were each stopping, Clark told Thurston the terms of the settlement. Thurston testifies that he vehemently protested; Clark insists that Thurston acquiesced. However this may be, they each agree that on the next morning Thurston most strenuously objected to Clark, and subsequently, when Miss Bullowa came in, to her and Clark. He insisted that he should have one-half of whatever was obtained by way of settlement. He even threatened to break up the settlement by going to the attorneys of the other side and making certain disclosures which would have that effect. Thus far the parties agree as to the happenings of this day, March 30th, 1905; but they radically differ from this point on. Miss Bullowa and Mr. Clark say that they replied to Thurston's demand by telling him that it was unreasonable and even ridiculous, and that they would not give him anything, and that he finally acquiesced in this, and even went so far as to insist upon signing a receipt for

all the money that Clark had advanced him pending the suit, and giving a written promise to repay all of this money, which amounted to $528.

Thurston's version is that Clark agreed to his demand, and that they arranged that what was obtained from the estate should be disposed of as follows: The $2,000 mortgage was to be canceled; the $3,000 note was to be paid; the expenses advanced by Clark were to be repaid to Clark; the balance was to be equally divided between them.

The bond and mortgage in question had been surrendered by the estate to Miss Bullowa, but had not been assigned to Clark in accordance with the agreement of settlement. Thurston insists that he requested an immediate cancellation of the mortgage, and that Miss Bullowa stated that she was too busy just then to draw the papers, and that upon her return to New York she would, for some little time, be too much occupied to give this matter further attention, but would do so later.

On the evening of the 30th of March the parties separated, Clark and Miss Bullowa returning to New York, and Thurston to Rome, Georgia.

On the 23d of May, 1905, Clark assigned the mortgage in question to the complainant. There is no evidence to show whether this assignment was for value or not.

On June 4th, 1905, Thurston writes from Georgia to Miss Bullowa that her promise to get the matter in shape to cancel the mortgage or transfer it to his wife has not been kept. Failing to hear from her, in about two weeks he writes in a similar strain to Clark. The replies of Miss Bullowa and of Clark to Thurston do not mention the fact that the mortgage has been assigned; nor do either of them point out, as would seem to have been the natural thing to do, that Thurston is making a claim directly in the face of the understanding between them and the facts. If it were the fact that Thurston had absolutely assigned to Clark his interest in the McKay estate, and that when the settlement by Clark with the estate was made on March 30th, 1905, this mortgage came to Clark, and he told Thurston at that time, as he says he did, that this mortgage was a valid

lien in his hands against Thurston, it is inconceivable to me that he should have replied to Thurston as he did.

I think it perfectly apparent that the assignment from Thurston to Clark of Thurston's claim against the McKay estate was not given upon any consideration, and that at that time there was not in the minds of any of the parties the slightest idea that it was. I think it clear that the reason for the assignment was that heretofore explained by me, namely, to enable Clark to appear as the absolute owner of this claim, to prevent offsets and counter-claims against Thurston, and also as a basis for an estoppel against the estate of McKay.

I think it undoubtedly is the fact that when Thurston, through McKay, in the year 1901, obtained the machinery of the hosiery company from Clark, he told Clark that if he made a success of this business he would make Clark whole on his investment in the original enterprise. Clark, it will be recalled, had put some $16,000 into this hosiery business, and owing to Thurston's ill health and inability to carry on the business, this money, together with that put in by Thurston, had been lost, and I think it quite clear that Thurston felt kindly to Clark, and felt as if he should make Clark whole, if he could do so, out of the earnings of the business when he resumed the same. But there is no credible evidence that there was any binding obligation upon Thurston of this character, or of any character. Clark's own letters to Thurston utterly refute the existence of any such obligation resting upon Thurston. He, in fact, states in one of his letters, referring to Thurston's purpose of repaying him if possible, that Thurston "is not bound to make repayment," and there is no evidence anywhere that Thurston was so bound.

The necessity of putting consideration back of this assignment, and of showing that Clark advanced money to Thurston on the faith of McKay's agreement with Thurston concerning the bridge, was undoubtedly conceived by the lawyers and communicated to Clark. In a long memorandum, written by Clark and sent to Thurston, with an injunction to destroy it, Clark outlines the testimony which will be necessary to be given to succeed in the suit against the McKay estate. He begins this memorandum by saying:

"I told my lawyers to-day that I remembered you showing the bridge papers to me on several occasions when I was at your house in Saddle River * * * some papers relating to the concession; that McKay's letters, as I remembered them, indicated that you were the owner and he acting as your agent."

It is thus clear that all evidence of apparent indebtedness from Thurston to Clark was fabricated years after the original dealings out of which the indebtedness is alleged to have arisen, solely for the purpose of recovering judgment against the McKay estate, and that no indebtedness did, as a fact, exist between Thurston and Clark.

With respect to the $2,000 mortgage, the evidence is entirely clear that Clark knew that Wiedersheim was the mere titular holder thereof; that McKay was the actual owner; that McKay agreed with him, Clark, that this mortgage was satisfied and should be canceled; and after the death of McKay and the institution of proceedings against his estate in Washington, Clark came into the possession of most, if not all, of the correspondence between Wiedersheim, McKay and Thurston, and learned from it that McKay had agreed with Thurston to cancel this mortgage.

Since the conclusions above stated result in finding that Clark was acting for Thurston in the collection of the claim against the McKay estate, and while so acting came into possession of this mortgage, it follows that he could not enforce this mortgage against Thurston. In the hands of McKay this mortgage was invalid, or no longer had vitality. This was so to the knowledge of Clark. Therefore in Clark's hands it was similarly affected. The sole question, as I view it, is whether this complainant has any better right than his assignor, Clark. The rule is entirely settled in this state that the assignor of a bond and mortgage takes, subject to all equities of the mortgagor. *Atwater* v. *Underhill, 22 N. J. Eq.* (*7 C. E. Gr.*) *599* (*Court of Errors and Appeals, 1872*) ; *Whitney* v. *Franklin, 28 N. J. Eq.* (*1 Stew.*) *126* (*Chancellor Runyon, 1877*) ; *Woodruff* v. *Morristown Institution for Savings, 34 N. J. Eq.* (*7 Stew.*) *174* (*Vice-Chancellor Van Fleet, 1881*) ; *Magie* v. *Reynolds, 51 N. J. Eq.* (*6 Dick.*) *113* (*Vice-Chancellor Pilney, 1893*) ; *Fisher* v. *Bull, 52 N. J.*

*Eq.* ('7 *Dick.*) *298* (*Court of Errors and Appeals, 1894*) ; *Tall-man* v. *Wallack*, *54 N. J. Eq.* (*9 Dick.*) *655* (*Court of Errors and Appeals, 1896*) ; *Mott* v. *Newark German Hospital*, *55 N. J. Eq.* (*10 Dick.*) *737* (*Vice-Chancellor Grey, 1897*).

And the statutes give similar rights of defence. *Gen. Stat. p. 2108 § 31; P. L. 1902 p. 532 § 61.*

There remains the matter of granting relief to the defendant upon his cross-bill. He therein sets up that this mortgage has been satisfied, and prays that it may be delivered up for cancellation. I have found that the mortgage is unenforceable and may not be foreclosed, and it should therefore be canceled unless this latter relief were withheld for considerations now to be stated.

Clark acted for Thurston in the proceedings which resulted in this mortgage being transferred from the McKay estate to Clark. He undoubtedly incurred expenses in that litigation, and, to the extent that he received anything for Thurston, probably would be entitled to a *quantum meruit* for his labor in acting as agent in the matter. It is true he was acting also in his own behalf, since his $3,000 note and the assigned claim of Thurston were all in one suit, but he was also put to extra trouble and labor on account of the Thurston claim. The total amount agreed to be allowed as a claim against the McKay estate was $12,500. The $2,000 mortgage and the accumulated interest on it was deducted; $2,000 in cash was advanced either directly out of the estate or indirectly by the executors. This left some $7,000 as the proven claim allowed against the estate. The $2,000 above mentioned, which was paid in cash, went to the attorneys who had participated in prosecuting the claim. It does not appear whether Clark was reimbursed any of the moneys that he had expended. It does, however, appear that he had this proven claim for $7,000 against the McKay estate, and it is not even attempted to be shown that this claim is not a perfectly good one, and that he will not receive all of it.

I therefore think that it appears that Clark was sufficiently secured for any moneys which might be due to him from Thurston on account of expenditures made by Clark in the prosecution of Thurston's claim. This leaves entirely out of account Thurston's contention that, under the agreement between him and

Clark, he was to receive the one-half of the total recovery, less the mortgage, the note to Clark, and the expenses.

I will advise that the bill be dismissed, and that the prayer of the cross-bill be granted.